O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RODERICK LYNN COLEMAN, | NO. CV 13-3268-MAN |
| Petitioner, | ORDER:  DENYING HABEAS PETITION; DISMISSING ACTION WITH PREJUDICE; AND DENYING A CERTIFICATE OF APPEALABILITY |
| v. | |
| G.D. LEWIS, | |
| Respondent. | |

On May 7, 2013, Petitioner, a California state prisoner, filed a habeas petition, which pleaded three claims ("Petition").  Respondent filed an Answer to the Petition and lodged the pertinent portions of the state record ("Lodg.").  Petitioner thereafter filed a Traverse.  The matter is fully briefed and under submission to the Court.[1]

**PRIOR STATE PROCEEDINGS**

Petitioner was tried jointly with codefendant Patrick McMillan in the Santa Barbara County Superior Court, although they were tried before separate juries.  On March 5, 2010, the jury found Petitioner guilty of first degree residential robbery, first degree burglary with a person present,

---

[1]     As of December 20, 2013, all parties had consented to have this case proceed to final judgment before the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b).

forcible rape, sexual penetration by foreign object, and cruelty to a child by endangering health. The jury also found true numerous enhancement allegations related to gang conduct and personal use of a firearm. (Lodg. No. 1, Clerk's Transcript ("CT") 700-09.) In addition, the jury found that Petitioner committed the rape and sexual penetration offenses during the course of a residential burglary within the meaning of California Penal Code § 667.61 (California's "One Strike" law). (CT 705, 707.) Petitioner thereafter was sentenced to a total term of 26 years plus 25 years to life. (CT 732-35, 799-802; Lodg. No. 9 at 2.)[2]

Petitioner appealed and raised the three claims alleged in the Petition. (CT 794-95; Lodg. Nos. 5, 8.) On March 7, 2012, the California Court of Appeal affirmed Petitioner's convictions in a written, reasoned decision. Petitioner sought review in the California Supreme Court. (Lodg. No. 11.) On June 13, 2012, the California Supreme Court denied review summarily. (Lodg. No. 12.)

**BRIEF SUMMARY OF THE EVIDENCE AT TRIAL**[3]

"Jane Doe"[4] grew up in Lompoc, California, and was still living there in October 2008. She lived with Troy Grant, her boyfriend, and their son Dante, who was a year and a half old, and Dasha, Grant's child from a previous relationship, who was six years old. (Lodg. No. 3, Reporter's

---

[2]    McMillan was convicted of the same offenses as Petitioner, as well as an additional charge of dissuading a witness, and McMillan's jury found numerous enhancement allegations to be true. In a bifurcated proceeding, the trial court found that McMillan had suffered two prior convictions (and related prison terms) within the meaning of California Penal Code § 667.5(b). McMillan was sentenced to a total prison term of 38 years plus 57 years to life. (CT 564-89, 710-12, 736-39, 803-06; Lodg. No. 9 at 1-2.)

[3]    Additional evidence presented at trial, which relates specifically to the issues presented in Grounds One and Two, will be discussed below in connection with those claims, rather than as a part of this brief summary.

[4]    The primary victim in this case was referred to at trial as "Jane Doe," and she will be referenced by that name or as "Doe" in this Order.

Transcript ("RT") 291-93, 648-49.) Doe had met Petitioner a few times prior to October 15, 2008, including at the home of her friend Bridgette Oliver, but Doe was not Petitioner's friend. Doe had not seen codefendant McMillan before October 15, 2008. (RT 344-45.). Oliver was acquainted with Petitioner and had seen Petitioner with McMillan on several occasions. (RT 756-57.) Grant went to the same high school as McMillan and had seen Petitioner around, but Grant was not a friend of either man. (RT 650.)

On October 15, 2008, Grant left home to work a night shift. Doe remained at home and put the two children to bed around 9:30 p.m. (RT 299-300, 655.) Oliver, who was Doe's best friend at the time, was at the house, and they watched television. Oliver left around 11:00 p.m., and Doe went to bed 15 minutes later. (RT 300-02.)

Doe fell asleep but woke when she heard a "fidgeting" sound coming from her front door knob. She sat up, got out of bed, and heard a "big boom." Two men ran into the room: one -- who Doe identified as McMillan -- had a "net" stocking over his face; and the other wore a gorilla mask and was holding a bat and a firearm. Both men were wearing gloves and referred to each other as "Cuz," a term Doe understood to be a name that members of the Crips gang call each other. McMillan grabbed Doe from behind and used his elbow to put pressure on her neck. (RT 301-09, 342-43.)

The two men demanded money and "weed," *i.e.,* marijuana. McMillan was choking Doe so "hard" that she started to lose sight and could not breathe. McMillan knelt Doe facedown over the bed and told the other man to get something to tie up her feet. Doe felt someone attempt to tie her ankles with a wire. (RT 309-11.) One of the intruders pulled Doe's pants down. She felt both men's hands on her. One of the men penetrated her vaginally with his penis, and it was painful. Thereafter, she was penetrated vaginally by a plastic object. (RT 311-15.)

McMillan stood up and again asked Doe for the location of money and weed, and Doe told

3

him the items were in the car and also in a jacket belonging to Grant.  The man in the gorilla mask obtained a backpack from the car, which contained the marijuana; however, there was no money in Grant's jacket.  McMillan again asked for money, and Doe told him it was in a jacket in the closet in her son's room.  During this time, McMillan had Doe in a chokehold.  He forced her to go to her son Dante's room, and the man in the gorilla mask retrieved the money from a jacket and went outside.  Approximately $1,100 was taken.  Dante was awake as this occurred.  (RT 315-18.)  McMillan took Doe into the hallway and said she had the option of either being tied up or knocked out.  Doe was crying and said, "just let me go."  McMillan walked Doe into Dasha's bedroom, knelt her over the bed, and told her to not move and to count to a thousand.  Dasha was awake and crying.  McMillan left.  (317-19.)

Shortly after McMillan left Dasha's room, Doe gathered the children and her purse and left in her car.  She called Grant and told him what happened, and he told her to bring the children to his workplace, which Doe did.  All of them then went to the hospital.  Grant called Oliver, who came and stayed with Doe, and Grant took the children to Doe's mother.  (RT 319-21, 657-59.)

Thereafter, a SART (Sexual Assault Response Team) nurse examined Doe.  (RT 330, 333, 846-48.)  Although Doe had difficulty breathing and swallowing, because her throat and neck felt crushed due to the chokehold, she was able to describe the attack and the intruders to Grant.  (RT 332-33, 660, 865, 868.)  Doe had bruising and abrasions in numerous areas of her body, her vaginal area was painful and tender, and the back of her neck was red, swollen, and tender.  (RT 334-38, 859-62, 868-69, 874, 877-79.)  Doe described the incident to the SART nurse and to a police officer, who interviewed her at the SART location.  (RT 854-73, 1028-36.)

Doe went to her parents' home after she left the SART location.  Oliver showed up 30 minutes later.  (RT 339.)  Doe described the incident to Oliver, including the assailants' appearances.  They looked at the MySpace website, Doe saw a photograph of McMillan, and she recognized him as the man who wore the net stocking mask.  Doe called Detective Clancy, who

had interviewed Doe at the SART location, and both Doe and Oliver told Clancy that:  when Doe described the assailants, Oliver said she thought she knew who one of them was; Oliver brought up McMillan's photograph on MySpace; and Doe said right away that the man depicted was one of the assailants.  (RT 340-44, 1064-65.)

McMillan was arrested on October 17, 2008, with $1,250.50 on his person.  (RT 933-34, 1077.)  Detective Clancy interviewed McMillan a few days later, and Petitioner stated that:  after he finished work on October 15, 2008, he came to Lompoc and visited Aundrice Dixon; he left Dixon's home at 11:00 p.m.; he then picked up Gloria Thomas; and they spent the night at his home in Santa Maria.  (RT 1074-76.)

A week later, Detective DeLauretis interviewed Dixon.  She told him she had seen McMillan and Petitioner on the afternoon of October 15, 2008, walking through her apartment complex, and they stopped by her residence at around 4:00 or 5:00 p.m.  (RT 941-42.)

On November 3, 2008, Detectives Clancy and DeLauretis interviewed Thomas.  (RT 948.)  Some time after October 16, 2008, Thomas, who had read an article about the crime in the newspaper, asked McMillan if he was involved, and he responded, "I was not there."  Thomas asked McMillan if Doe has been raped, and he said, "Not to my knowledge."  (RT 951-52.)  Thomas thereafter started to cry during the interview and said she was scared.  She said that, during the same conversation with McMillan, he told her she needed to get his car and remove some clothing from his house (which she did), and he also said, "We did go in the house."  (RT 952-53, 1058.)  McMillan asked Thomas to get a message to Petitioner, who had not yet been located by the police, "to stay where he's at and not come in," and to have her boyfriend give a false alibi for Petitioner.  (RT 953-55, 1058.)  Thomas stated that she was not with McMillan on the evening of October 15, 2008, as he claimed.  (RT 954.)

Detective Clancy interviewed Oliver on November 4, 2008.  Oliver stated that when she

spoke with Doe after the incident and heard Doe's descriptions of the assailants, Oliver believed that Doe was describing McMillan and Petitioner.  Oliver said that Petitioner and McMillan were always together, and around that time frame, she spoke with Petitioner daily.  Petitioner called Oliver on October 15, 2008, while she was at Doe's house, and again on October 16, 2008, at which time he said "he didn't rape nobody," and she told him to turn himself in.  (RT 755, 1068-70.)  At trial, Oliver denied having told anyone that Petitioner matched the description of the second assailant. (RT 755.)  Oliver testified that when she told Detective Clancy she had advised Petitioner to turn himself in, it "had nothing to do with" the crimes committed against Doe and, instead, related to an outstanding warrant for something else.  (RT 761.)

Petitioner confessed that:  he and McMillan broke into Doe's home, stole marijuana, and attempted to tie Doe up; and McMillan physically assaulted Doe, although Petitioner denied that either man raped her.  (Lodg. No. 2 at 85-95, 104, 109-10, 112-13, 116-17, 132-36.)  Evidence of Petitioner's confession was not presented to McMillan's jury.  (RT 988-1000, 1003-13, 1015.)

## PETITIONER'S HABEAS CLAIMS

In *Ground One*, Petitioner contends that his Confrontation Clause rights were violated by the admission of evidence of certain statements by codefendant McMillan (who did not testify) to Petitioner and third parties, both in writings and telephone conversations.  (Petition at 5 and attachment 7-a(1).)

In *Ground Two*, Petitioner contends that insufficient evidence was presented at trial to support the California Penal Code § 186.22(b)(1) criminal street gang enhancement allegations found by the jury to be true.  (Petition at 5 and attachment 7-b(1).)

In *Ground Three*, Petitioner contends that the trial court violated Petitioner's rights to due process and a fair trial by permitting the gang expert to testify about inflammatory gang-related

1   evidence.  (Petition at 5-6 and attachment 7c-(1).)

2

3                      **STANDARD OF REVIEW**

4

5        Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty

6 Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the merits" cannot

7 obtain federal habeas relief unless that adjudication:  "(1) resulted in a decision that was contrary

8 to, or involved an unreasonable application of, clearly established Federal law, as determined by

9 the Supreme Court of the United States; or (2) resulted in a decision that was based on an

10 unreasonable determination of the facts in light of the evidence presented in the State court

11 proceeding." *See also* Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("By its terms § 2254(d)

12 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the

13 exceptions in §§ 2254(d)(1) and (d)(2).").

14

15        Clearly established federal law, for purposes of Section 2254(d)(1) review,[5] means Supreme

16 Court holdings in existence at the time of the relevant state court decision.  Greene v. Fisher, 132

17 S. Ct. 38, 44-45 (2011); *see also* Cullen v. Pinholster, 131 S. Ct. 1388, 1399 (2011); Richter, 131

18 S. Ct. at 785.  Deference to a state court decision is required absent a Supreme Court decision

19 that either "'squarely addresses'" the issue in the case before the state court or establishes a legal

20 principle that "'clearly extends'" to a new context.  Varghese v. Uribe, 736 F.3d 817, 824 (9th Cir.

21 2013) (citation omitted), *cert. denied*, 134 S. Ct. 1547 (2014); Moses v. Payne, 555 F.3d 742, 760

22 (9th Cir. 2009); *see also* Richter, 131 S. Ct. at 786 (it "'is not an unreasonable application of

23

24 _____

25        [5]    In his Traverse (at p. 2), Petitioner asserts conclusorily that the state court's rejections of each of his three claims on their merits was based on both an unreasonable

26 application of clearly established federal law and an unreasonable determination of the facts. However, Petitioner does not identify any allegedly erroneous factual determination within the

27 meaning of Section 2254(d)(2), and his arguments are premised on legal error and evidentiary insufficiency, not factual error.  Accordingly, Section 2254(d)(1) is the governing review standard

28 in this case.

clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by'" the Supreme Court) (citation omitted).  While circuit precedent is relevant "to ascertain whether [a circuit] has already held that the particular point in issue is clearly established by Supreme Court precedent," circuit precedent may not "be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450-51 (2013) (*per curiam*); *see also* Murray v. Schriro, 745 F.3d 984, 997 (9th Cir. 2014) ("Our precedent *cannot* be mistaken for clearly established Supreme Court law.").

Under Section 2254(d)(1)'s first prong, a state court decision is "contrary to" clearly established federal law if the state court applies a rule that contradicts the relevant Supreme Court holdings or reaches a different conclusion than that reached by the high court on materially indistinguishable facts.  Price v. Vincent, 123 S. Ct. 1848, 1853 (2003).  "Thus, the 'contrary to' prong requires a direct and irreconcilable conflict with Supreme Court precedent."  Murray, 745 F.3d at 997.

Section 2254(d)(1)'s second, "unreasonable application" prong constitutes an objective standard that is not satisfied merely by finding that a state court erred in applying clearly established federal law.  Richter, 131 S. Ct. at 785; Lockyer v. Andrade, 123 S. Ct. 1166, 1174 (2003).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold."  Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007) ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *see also* Xiong v. Felker, 681 F.3d 1067, 1074 (9th Cir. 2012) (a finding that the state court was incorrect or erroneous is insufficient to warrant habeas relief, because the Section 2254(d)(1) "inquiry is strictly limited to whether the state court's application of clearly established Supreme Court precedent" was objectively unreasonable), *cert. denied*, 133 S. Ct. 989 (2013).

"[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief is precluded by Section 2254(d).  Richter, 131 S. Ct. at 786 (citation omitted); *see also id.* at 786-87 (a petitioner is required to prove that the state decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement").  "Under § 2254(d), a habeas court must determine what arguments supported or, as [in the case of a silent denial of relief], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of this Court."  *Id.* at 786.  A federal court has the authority to issue habeas relief only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  *Id.*; *see also* Murray, 745 F.3d at 998 ("The deferential standard imposed under AEDPA cloaks a state court's determination with reasonableness, so long as 'fairminded jurists could disagree' as to whether a claim lacks merit.") (citation omitted).

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"  Renico v. Lett, 130 S. Ct. 1855, 1862 (2010) (citations omitted).  "[T]he purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction."  Greene, 132 S. Ct. at 43 (citation and quotation marks omitted); *see also* Richter, 131 S. Ct. at 786 (the AEDPA standard was intended to be "difficult to meet").  "The petitioner carries the burden of proof."  Pinholster, 131 S. Ct. at 1398.

The three claims set forth in the Petition indisputably are governed by the Section 2254(d) standard of review, because these three claims were raised on direct appeal and resolved on their merits.  For purposes of its Section 2254(d)(1) analysis, the Court looks through the California Supreme Court's silent denial to the reasoned decision of the California Court of Appeal resolving

1  both claims on their merits.  Cannedy v. Adams, 706 F.3d 1148, 1158-59 (9th Cir.), *amended by*

2  733 F.3d 794, *cert. denied*, 134 S. Ct. 1001 (2013); *see also* Berghuis v. Thompkins, 130 S. Ct.

3  2250, 2259 (2010) (when claims were raised on appeal and denied by state court of appeal on

4  their merits in a reasoned decision, and the state supreme court denied discretionary review, the

5  "relevant state-court decision" for purposes of Section 2254(d) review was the state court of

6  appeal decision); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012) (a federal habeas court must

7  "look through state-court summary denials to the last reasoned state-court opinion on the claim

8  at issue," *i.e.*, the California Court of Appeal's decision on appeal affirming the petitioner's

9  conviction).

10

11                                    **DISCUSSION**

12

13  **I.     Petitioner's Confrontation Clause Claim Does Not Warrant Federal Habeas**

14  **Relief.**

15

16        In Ground One, Petitioner contends that he was deprived of his federal constitutional rights

17  under the Confrontation Clause, because evidence was presented of written and oral statements

18  made by codefendant McMillan to Petitioner and third parties.  Specifically, Petitioner complains

19  about evidence admitted regarding telephone calls between McMillan and Gloria Thomas, letters

20  from McMillan to Petitioner, and letters from McMillan to third parties.  Petitioner complains that:

21  these communications constituted inadmissible hearsay and, thus, were inadmissible; and

22  moreover, because McMillan did not testify at trial, Petitioner was deprived of his right to confront

23  and cross-examine McMillan about these communications.  He contends that the state court erred

24  in finding that, under California law, the statements at issue were admissible under two exceptions

25  to the hearsay rule and, further, were not barred by the *Bruton* rule (discussed *infra*).  (Petition

26  at 5 and attachment 7a-(1).)

27

28

1

**A.** **Background**

2

3      The California Court of Appeal made extensive factual findings relevant to Ground One.

4    Under 28 U.S.C. § 2254(e)(1), these factual findings are presumed true unless rebutted by clear

5    and convincing evidence. *See, e.g.,* Miller-El v. Cockrell, 123 S. Ct. 1029, 1041 (2003).  As neither

6    party has challenged such findings, and they are consistent with the Court's own review of the

7    record, the Court quotes them below as background for Ground One.[6]

8

9          Prior to trial, McMillan made a motion for severance arguing that admission

10      of certain statements by [Petitioner] would deny him the right to cross-examination

11      if [Petitioner] did not testify.   [Petitioner] joined in the motion arguing that

12      admission of statements by McMillan would have the same effect if McMillan did not

13      testify.  The trial court denied severance but ordered separate juries for McMillan

14      and [Petitioner].

15

16          While in jail awaiting trial, McMillan and [Petitioner] exchanged numerous

17      written communications referred to as "letters" or "kites."  There were also letters

18      and telephone calls by McMillan and [Petitioner] to third parties.  In motions in

19      limine, the prosecution sought a ruling that the written and telephonic

20      communications were admissible as admissions, adoptive admissions, statements

21      between co-conspirators, evidence giving context to other evidence, and evidence

22      relied on by the prosecution's gang expert.  McMillan and [Petitioner] argued that

23      admission would violate the *Bruton/Aranda* rule and [such communications] were

24      not admissible under any exception to the hearsay rule.  The trial court ruled that

25      the communications were admissible.

26    _____

27        [6]      With respect to the evidence of letters and oral statements, which was admitted at
      trial and is described by the California Court of Appeal as quoted above, the Court has interposed
28    bracketed record citations that indicate where in the record such evidence is set forth.

Evidence admitted pursuant to the ruling included letters from McMillan to [Petitioner], letters from [Petitioner] to McMillan, letters from McMillan to friends, letters from [Petitioner] to friends, letters from third parties to [Petitioner], and telephone conversations between McMillan, Gloria Thomas and [Grant].  [Petitioner] wrote letters to friends asking the friends to remember their loyalties and help [Petitioner] avoid prosecution for the charged offenses.  Some letters also indicated that he was worried that some people might "snitch" on him.

In one letter to his cousin, [Petitioner] stated:  "Me and Pat [McMillan] are trying to get out of here. . . .  Will you please write him [unidentified] and tell him to stop being so uptight because me and Pat need you and DeShawn is stepping on our toes by telling you things that you shouldn't do, that we need you to do.  Make sense?  Here is a hint.  LHRT.[7]  Do you even remember what that means? . . .  It's our code word. . . .  So make sure whenever you write or talk to him you refer to what you and your sis and Keyana is doing as the LHR . . . or the get down."  In a letter to Keyana Coleman, [Petitioner] stated:  "But I need you to holla at the boy and let him know they will subpoena his girl.  So either they leave town . . . or she must plead the fifth. . . .  Since she is the alleged 'victim' and the only witness, my nigga 'P' was like can't make her relive what she supposedly went through.  We know she's lying.  The DA don't."  [*See* RT 1085-86, 1138-39.]

[Petitioner] wrote letters to McMillan about various subjects unrelated to the charges against them but sometimes suggesting knowledge of the crimes.  In one letter, [Petitioner] stated:  "I really need a female on the outside on the team right now even though she's a slut, she can be of use.  LHRT."  [Petitioner] told Mcmillan

---

[7]     Footnote 4 in original:  "The meaning of 'LHRT' is unclear, but appears to refer to loyalty between [Petitioner] and McMillan and other individuals."

in another letter that he had written to his lawyer and "gave him the whole spizziel[8] from Point A to Point B. I tried to tell those people I was at my auntie Robi's house that morning but they didn't want to believe my Black ass. So I put together a story from all the rumors I heard on the streets and gave it to them how I heard myself." [*See* RT 1092, 1129-20.)

McMillan wrote letters to [Petitioner] stating that there was no evidence against them except [Petitioner's] confession. He also referred to attempts to convince other people to help him on the case, and expressed concern that some might falter in their support. In one letter McMillan told [Petitioner]: "My focus has always been GeGe and it still is because that's all that matters. JoJo has been back full swing and she's going to get on it ASAP. As long as GeGe pays that 5,000 bucks its 100. . . . When I say I've been on it, trust me. As far as M and R go, whenever you get at them, just tell them not to say something stupid. Brother, I think things will work out." McMillan wrote to a relative regarding the charges and expressed his belief that the charges should be resolved through "street justice" rather than trial. The letter stated: "I'm hoodsta or as you would say gangsta in every essence of the word. I hope to God those 'good people' got through to that dude so he keeps it hood. Yeah, his broad told four different stories and there's no evidence, but with that said I'm still in jail, so my belief remains street justice." McMillan also wrote a letter to Keyana Coleman which asked her to "get O boy's girl's number so you can talk directly to her instead of going through her dude. Speak to her." [*See* RT 1125-26, 1109, 1149-50.]

There was also evidence of verbal and written communications involving

---

8    Footnote 5 in original: "Use of 'zz' in a word is a code. The 'zz' should be deleted from the word to discover its true meaning. In other words, 'spizziel' refers to the word 'spiel.'"

Tyrone Leekins.  Tyrone Leekins heard McMillan and [Petitioner] discussing a "come up" before the offenses had been committed.  Leekins believed that the "come up" referred to an impending robbery.  The next day [Petitioner] told Leekins that he had gotten money and marijuana from a "come up on Tip."  "Tip" is a nickname for [Grant].  [Petitioner] also wrote letters to Leekins when both men were in jail.  The letters told Leekins to get out of protective custody and made vague references to the reason why [Petitioner] was in jail.  One letter stated:  "I know you didn't expect this.  From me, huh.  I'm good man.  But I'm so good at this lyin ass female that don't testify but about you my cousin wrote this and told me you're in PC.  Nigger, I know you're a premiere writer from 805.  Please, my nigger, get out of there."  [Petitioner] also told Leekins that he wanted the matter to be handled in the "streets" and "100 percent hood."  [RT 446-48, 456, 459-60.]

In letters by McMillan to friend Gloria Thomas, McMillan asked Thomas to provide an alibi for him.  A few days after the offenses, McMillan and Thomas spoke multiple times on the telephone.  McMillan asked Thomas to tell [Petitioner], who had not yet been arrested, to "stay solid."  McMillan stated:  "That mother fucker (inaudible) ya mean, but uh.  Shit, you know when that — that time comes, just let that mother fucker know, to stay solid."  McMillan also inquired about what the police were doing in the investigation, and whether certain people were saying good or bad things, and to contact certain people to help prepare an alibi.  One of the telephone calls took place between McMillan, Thomas, and victim [Grant].  McMillan asked [Grant] whether [Grant] was "keeping it street or letting mother fuckers make decisions for you. . . . Like the police."  McMillan told [Grant] that [Grant] and his wife were the only people who mattered, and "I'm just saying . . . we're gonna keep it in the street not see what happens.  Keeping it street."  [Lodg. No. 2, Supplemental Clerk's Transcript ("SCT") 27-28, 43-46.]

(Lodg. No. 9 at 4-6.)

### B.     The Clearly Established Federal Law That Governs Ground One

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  U.S. Const. amend. VI.  In Crawford v. Washington, 124 S. Ct. 1354 (2004), the Supreme Court held that the Confrontation Clause bars the admission of "testimonial" out-of-court statements by witnesses not appearing at trial unless either (1) the statements are offered for purposes other than proving the truth of the matter asserted or (2) the witnesses are unavailable and the defendant had a prior opportunity to cross-examine them.  Id. at 1364–65, 1369 & n.9.  Critically, however, only "testimonial statements" implicate the Confrontation Clause and Crawford's holding. Davis v. Washington, 126 S. Ct. 2266, 2273 (2006); see also Whorton v. Bockting, 127 S. Ct. 1173, 1183 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement").

In Crawford, the Supreme Court declined to define the meaning of "testimonial."  124 S. Ct. at 1374 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'").   Subsequent Supreme Court cases suggest, however, that a statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events.  See Williams v. Illinois, 132 S. Ct. 2221, 2242 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions."); Melendez–Diaz v. Massachusetts, 129 S. Ct. 2527, 2532 (2009) (opining that a statement is "testimonial" if it was made for an "evidentiary purpose" and "under circumstances which would lead an objective

1    witness reasonably to believe that the statement would be available for use at a later trial")

2    (internal citation and quotation marks omitted).

3

4        As the Ninth Circuit has observed, Crawford's discussion of what may constitute a

5    testimonial statement was premised on the use of statements "made to a government officer with

6    an eye toward trial, the primary abuse at which the Confrontation Clause was directed." Jensen

7    v. Pliler, 439 F.3d 1086, 1089 (9th Cir. 2006).   "Although Crawford did not define 'testimonial' or

8    'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,'

9    which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or

10   proving some fact,' and noted that '[a]n accuser who makes a formal statement to government

11   officers bears testimony in a sense that a person who makes a casual remark to an acquaintance

12   does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th Cir. 2008) (the state court's finding

13   that a victim's statements to her coworkers were not "testimonial" for Confrontation Clause

14   purposes was not contrary to or an unreasonable application of Crawford).

15

16       That said, Supreme Court precedent still does not define "testimonial" and "nontestimonial"

17   statements with precision.   See Flournoy v. Small, 681 F.3d 1000, 1004, 1005 (9th Cir. 2012)

18   (stating that Crawford and its progeny fail to "delineate precisely what statements qualify as

19   'testimonial'").   In the absence of a clearly established Supreme Court definition of "testimonial,"

20   a federal habeas court must give state courts "leeway" in their case-by-case applications of

21   Crawford and subsequent decisions.   Yarborough v. Alvarado, 124 S. Ct. 2140, 2149 (2004) ("The

22   more general the rule, the more leeway state courts have in reaching outcomes in case-by-case

23   determinations.").

24

25       Historically, the Confrontation Clause has had a specific application to certain statements

26   made by nontestifying codefendants.   Under what is commonly called the Bruton rule, or the

27

28

1   *Bruton/Aranda* rule in California cases,[9] the Confrontation Clause may be violated when

2   statements made by a nontestifying codefendant are proffered as evidence *if* such statements

3   directly implicate another defendant who has not, or will not have, an opportunity to cross

4   examine the codefendant regarding the statements. <u>Bruton</u>, 88 S. Ct. 1620, 1623, 1628 (1968).

5   The *Bruton* rule applies even if the jury is instructed to consider the nontestifying codefendant's

6   statements only against him. *Id.* The *Bruton* rule assumes that the statement by the

7   nontestifying codefendant, on its face, "expressly" implicates the other defendant; if it does not,

8   or only implicates the other defendant when linked with evidence introduced later at trial, the rule

9   has no application. <u>Richardson v. Marsh</u>, 107 S. Ct. 1702, 1707-09 (1987).

11   In <u>Bruton</u>, the government did not attempt to use the confession of Bruton's codefendant

12   as evidence against Bruton himself because, under the prevailing rules of evidence, the confession

13   constituted inadmissible hearsay if used against Bruton. The Supreme Court noted this distinction

14   and expressly reserved the question of whether the Confrontation Clause is violated by the

15   admission of one defendant's extrajudicial statements *against* his codefendant at their joint trial

16   under an exception to the hearsay rule:

18   We emphasize that the hearsay statement inculpating petitioner was clearly

19   inadmissible against him under traditional rules of evidence. . . . There is not before

20   us, therefore, any recognized exception to the hearsay rule insofar as petitioner is

21   concerned and we intimate no view whatever that such exceptions necessarily raise

22   questions under the Confrontation Clause.

24   <u>Bruton</u>, 88 S. Ct. at 1623 n.3 (citations omitted); *see also* <u>United States v. Arceneaux</u>, 437 F.2d

25   924, 927 n.5 (9th Cir. 1971) ("Bruton expressly refrained from the expression of an opinion in

---

28   [9]   <u>Bruton v. United States</u>, 88 S. Ct. 1620 (1968), and <u>People v. Aranda</u>, 63 Cal. 2d 518 (1969).

cases where the hearsay rule is not violated."); United States v. York, 933 F.2d 1343, 1362 n.3 (7th Cir. 1991) ("*Bruton* only prohibits the use of an inculpatory hearsay statement against an accused when the jurisdiction's rules of evidence do not permit the statement to be introduced into evidence against the accused.  Where the rules so permit, *Bruton* is inapplicable."), *overruled on other grounds by* Wilson v. Williams, 182 F.3d 562 (7th Cir. 1999); People v. Smith, 135 Cal. App. 4th 914, 922 (2006) (the *Bruton* rule "presumes the statement is an admissible admission by the declarant and inadmissible hearsay against the codefendant . . ., [and] if the statement is *admissible* against the codefendant under a hearsay exception, and its admission otherwise survives confrontation analysis, then the jury may consider it against the codefendant; no reason exists for severance or redaction").

Bruton was decided over 25 years before the Supreme Court, in Crawford, effected a sea change in Confrontation Clause jurisprudence by refocusing the constitutional litmus test on whether a statement was "testimonial," as opposed to whether it passed the previously applicable "indicia of reliability" test.[10]  As the California Court of Appeal correctly recognized when deciding Petitioner's appeal, there is a "developing body of law that *Bruton* [does] not apply to non-testimonial statements at all."  (Lodg. No. 9 at 7 n.6.)  To date, the federal circuit courts have concluded that Bruton must be applied in the light of Crawford, and thus, the *Bruton* rule does not apply at all when the codefendant's statement is nontestimonial.  *See, e.g.,* Smith v. Chavez, 2014 WL 1229918, at *1 (9th Cir. March 4, 2014) (because the out-of-court statement by the nontestifying codefendant -- an account of the crime given to his girlfriend in a motel -- "was clearly not testimonial," it was reasonable for the state court to reject a Bruton claim, "given that

_____

[10]      Prior to Crawford, it was clearly-established federal law that, if a declarant was unavailable, his statement was admissible only if it bore "adequate indicia of reliability."  Ohio v. Roberts, 100 S. Ct. 2531, 2539 (1981).  The requisite indicia of reliability could be established when the evidence fell within a firmly rooted hearsay exception or there was a showing of "'particularized guarantees of trustworthiness'" with respect to the statement at issue.  Idaho v. Wright, 110 S. Ct. 3139, 3146 (1990); *see also* Lilly v. Virginia, 119 S. Ct. 1997, 1894 (1999) (plurality opinion).

1   *Bruton's* core holding relies on the Confrontation Clause" and <u>Crawford</u> teaches that the

2   Confrontation Clause bars only testimonial out-of-court statements); <u>United States v. Dargan</u>, 738

3   F.3d 643, 651 (4th Cir. 2013) (a finding that a codefendant's statements were nontestimonial

4   "dispatch[ed]" a defendant's <u>Bruton</u> claim, because:  "*Bruton* is simply irrelevant in the context

5   of nontestimonial statements.  *Bruton* espoused a prophylactic rule designed to prevent a specific

6   type of Confrontation Clause violation.  Statements that do not implicate the Confrontation Clause,

7   *a fortiori*, do not implicate *Bruton*."); <u>United States v. Figueroa</u>, 729 F.3d 267, 276 n.14 (3d Cir.

8   2013) ("The protections of the Confrontation Clause and *Bruton* apply only to testimonial

9   statements."); <u>United States v. Figueroa-Cartagena</u>, 612 F.3d 69, 85 (1st Cir. 2010) ("It is thus

10  necessary to view *Bruton* through the eyes of *Crawford* and *Davis*.  The threshold question in

11  every case is whether the challenged statement is testimonial.  If it is not, the Confrontation

12  Clause has 'no application.'" (citation omitted)); <u>United States v. Smalls</u>, 605 F.3d 765, 768 n.2

13  (10th Cir. 2010) ("the *Bruton* rule, like the Confrontation Clause upon which it is premised, does

14  not apply to nontestimonial hearsay statements"); <u>United States v. Dale</u>, 614 F.3d 942, 958 (8th

15  Cir. 2010) ("Reading *Bruton* in light of *Crawford*, we conclude that a *Bruton* violation must be

16  predicated on a *testimonial* out-of-court statement implicating a co-defendant."); <u>United States</u>

17  <u>v. Johnson</u>, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation

18  Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial

19  statements."); <u>United States v. Taylor</u>, 509 F.3d 839, 850 (7th Cir. 2007) (finding no *Bruton* error,

20  because the challenged remarks were nontestimonial under *Crawford* ).

21

22        **C.     The State Court Decision.**

23

24        With respect to the challenged evidence of extrajudicial statements by McMillan and

25  Petitioner, the California Court of Appeal concluded that "[t]here was no confrontation clause

26  violation because the statements were non-testimonial, and admissible under exceptions to the

27  hearsay rule." (Lodg. No. 9 at 7.)  The California Court of Appeal initially noted the *Bruton/Aranda*

28  rule, *i.e.,* that "[a]dmission of an out-of-court statement by a non-testifying defendant which

1    incriminates a codefendant in a joint trial generally violates the confrontation clause if the

2    statement would be inadmissible against the codefendant in a separate trial."  (Lodg. No. 9 at 7,

3    *citing* Bruton and Aranda.)  The state appellate court further observed that:  "[i]f the statements

4    would have been admissible in a separate trial under an exception to the hearsay rule, they are

5    also admissible in a joint trial"; and "[a]lthough admission of out-of-court *testimonial* statements

6    is barred even if admissible under a hearsay exception, there is no confrontation clause violation

7    when *non-testimonial* statements are admitted under a state law exception to the hearsay rule."

8    (*Id.*, *citing, inter alia*, Crawford, Davis, and Whorton.)

9

10       The California Court of Appeal then noted it was "uncontested that the challenged

11   statements are non-testimonial" and described them as "informal statements to an associate or

12   friend, not formal statements to a government officer."  (Lodg. No. 9 at 7.)

13

14       Here, McMillan and [Petitioner] never intended to or spoke to anyone

15       connected with law enforcement.  They were not being interrogated or asked

16       questions by a government official.  They spoke to each other and to friends and

17       relatives in an attempt to assess and respond to their predicament, and believed

18       they could speak openly and freely.  These circumstances are essentially the

19       opposite of giving testimony. . . .

20

21       In addition, many of the statements are not incriminating in themselves.

22       McMillan and [Petitioner] usually spoke in vague language about what

23       acquaintances and the victims of the offenses were saying to the police and to

24       others.  Both appellants were aware of why they had been arrested, and their

25       communications focus on means to extricate themselves from prosecution for the

26       offenses.  Some of the statements imply involvement in the commission of the

27       offenses, but avoid any direct admission of involvement by either appellant.

28

1    (*Id.* at 8; citation omitted.)   Thus, the California Court of Appeal reasoned, the Confrontation

2    Clause was not implicated, because the statements at issue were nontestimonial.  (*Id.*)

3

4         Next, the California Court of Appeal found that, "[i]n any event," the challenged evidence

5    was admissible in a joint trial under the co-conspirator exception to the hearsay rule.  (Lodg. No.

6    9 at 8, *citing, inter alia,* California Evidence Code § 1223.)  The state appellate court found the

7    evidence demonstrated that:  under California law, a conspiracy existed "to avoid prosecution by

8    dissuading witnesses and fabricating alibis and other exculpatory evidence"; "the statements were

9    made by participants in the conspiracy and furthered the objectives of the conspiracy"; this

10   "conspiracy may be deemed to extend beyond the crime to activities contemplated and

11   undertaken by the conspirators in pursuance of the objectives of the conspiracy"; and there was

12   "circumstantial evidence that appellants conspired with each other to rob and burglarize the home

13   of [Grant] and Jane Doe."  (Lodg. No. 9 at 8-10.)

14

15        [S]ubstantial evidence supports the conclusion the McMillan–[Petitioner] conspiracy

16        included the goal of avoiding prosecution and conviction in any way possible,

17        including by dissuading witnesses from testifying.  At the time of the statements,

18        McMillan and [Petitioner] had or perceived some ability to alter their fate by acting

19        in concert.  The object of the conspiracy had not been attained or defeated and

20        remained ongoing while appellants were awaiting trial for the charges.   The

21        challenged statements also furthered the object of the conspiracy.  The statements

22        sought to dissuade witnesses from testifying or otherwise cooperating with the

23        police, and also to create favorable testimony whenever possible.

24

25   (*Id.* at 9.)[11]

26   _____

27        [11]    The California Court of Appeal also found that the challenged evidence was
     admissible on an additional ground, namely, under the declaration against penal interest exception
28   to the hearsay rule.  (Lodg. No. 9 at 10, *citing* California Evidence Code § 1230.)

1          **D.     The State Court Decision Is Entitled To Deference.**

2

3          As the state court acknowledged, courts interpreting the interplay of the clearly established

4   Confrontation Clause precedent of <u>Bruton</u> and <u>Crawford</u> have concluded that the *Bruton* rule is

5   inapplicable if the statement at issue is not precluded by <u>Crawford</u>, *i.e.,* because it is

6   nontestimonial and, thus, does not implicate the Confrontation Clause.  The Circuit Courts "appear

7   to have unanimously concluded that where a statement is non-testimonial, neither *Crawford* nor

8   *Bruton* apply." <u>Hundley v. Montgomery</u>, 2014 WL 1839116, at *12 (E.D. Cal. May 8, 2014) (No.

9   2:12-cv-3051-JKS).  Significantly, <u>Crawford</u> did not address the effect of its dramatic change in

10  Confrontation Clause jurisprudence on the *Bruton* rule.  Since the <u>Crawford</u> decision issued, there

11  has not been any Supreme Court decision addressing whether the *Bruton* rule applies when a

12  codefendant's statement is nontestimonial in nature -- a situation, post-<u>Crawford</u>, that would *not*

13  implicate the Confrontation Clause at all had the statement been made by a third party who was

14  not a codefendant.

15

16         In any event, the state court's conclusion that the statements at issue were nontestimonial

17  plainly was an objectively reasonable application of Supreme Court precedent.  Indeed, in their

18  appeals, neither Petitioner nor McMillan claimed that the challenged statements were testimonial

19  within the meaning of <u>Crawford</u>.  (*See* Lodg. Nos. 4-5, 6-7, and 10-11, *passim.*)  While it was

20  "uncontested" that the statements were nontestimonial (Lodg. No. 9 at 7), had any claim been

21  made that the statements were testimonial, it would have been frivolous.   The statements

22  challenged by Petitioner were made between friends, associates, and fellow gang members in

23  casual letters and conversations.  Supreme Court precedent suggests that the statements at issue

24  were nontestimonial, because at the time the declarants were speaking, they had no reason to

25  expect that their statements would be used as evidence in a trial or a criminal investigation.  *See*

26  <u>Williams</u>, 132 S. Ct. at 2242; <u>Melendez–Diaz</u>, 129 S. Ct. at 2532.  There was no formality to any

27  of these communications, no governmental involvement, and no view toward the statements

28  being used at trial when they were made.  Indeed, there was no reason why McMillan and those

1   with whom he communicated would have believed that the primary purpose of the statements
2   would be for prosecuting Petitioner and McMillan.  The blunt, and at times cryptic and/or profane,
3   statements between fellow gang members and their female associates using gang vocabulary and
4   vernacular were, as the California Court of Appeal aptly and accurately described them,
5   "essentially the opposite of giving testimony." (Lodg. No. 9 at 8.)  There simply is no tenable
6   basis for finding that the challenged statements fall on the "testimonial" side of the
7   "testimonial/nontestimonial" litmus test for Confrontation Clause analysis established by Crawford.

8

9       The state court's conclusion -- that the statements by McMillan, Petitioner, and others were
10  not "testimonial" and, thus, did not implicate the Confrontation Clause -- was reasonable for
11  purposes of Section 2254(d)(1).  This finding dooms Ground One to the extent that the claim can
12  be construed to raise a generalized Confrontation Clause claim with respect to the admission of
13  statements by McMillan.  To the extent that Ground One raises, as it appears, a more specific type
14  of Confrontation Clause claim, *i.e.,* a Bruton challenge to the admission of the made by McMillan,
15  Ground One nonetheless still fails.  If, as the overwhelming weight of federal authority interpreting
16  Crawford and Bruton holds, nontestimonial statements do not implicate Bruton, then that is the
17  end of the matter, and Ground One fails for that reason alone.  If, for Section 2254(d)(1)
18  purposes, such authority is deemed to deal with an issue in flux, *i.e.,* one that is unsettled under
19  existing Supreme Court precedent, then Ground One also necessarily fails, because the question
20  is an open one for purposes of AEDPA review.  *See, e.g.,* Knowles v. Mirzayance, 129 S. Ct. 1411,
21  1419 (2009) (Section 2254(d)(1) is not satisfied when a state court has "decline[d] to apply a
22  specific legal rule that has not been squarely established by" the Supreme Court); Carey v.
23  Musladin, 127 S. Ct. 649, 654 (2006); *see also* Crater v. Galaza, 491 F.3d 1119, 1123 (9th Cir.
24  2007) (if habeas relief depends upon the resolution of an open question under Supreme Court
25  decisions, "Section 2254(d)(1) precludes relief").

26

27      Petitioner acknowledges the "tension" and "conflict between the" *Bruton* rule and the
28  significant change in Confrontation Clause jurisprudence effected by Crawford but argues that,

1   because the Supreme Court has not expressly overruled <u>Bruton</u>, the state court erred in finding

2   no Confrontation Clause violation given the nontestimonial nature of the statements at issue.  He

3   argues that <u>Crawford</u>'s testimonial/nontestimonial distinction must "be limited to hearsay from

4   sources other than non-testifying co-defendants."  (Petition at attachment 7a-(1), pp. 5-6.)

5   Petitioner's argument misapprehends the nature of this Court's review under Section 2254(d)(1),

6   which requires the Court to determine whether the state court misapplied *clearly established*

7   Supreme Court precedent, not to second guess a state court's application of law that is uncertain

8   and/or in flux.  Moreover, Petitioner's argument only underscores that deference to the state

9   court's decision is required here, because his assertions regarding how courts should resolve the

10   "tension" and "conflict" between <u>Bruton</u> and <u>Crawford</u> make clear that this is an issue that is

11   uncertain under existing Supreme Court precedent.

13   Moreover, as discussed earlier and as is critical for Section 2254(d)(1) purposes, <u>Bruton</u>

14   expressly did *not* resolve the question of whether the Confrontation Clause is violated by the

15   admission of a codefendant's statement pursuant to a state law exception to the hearsay rule.

16   <u>Bruton</u>, 88 S. Ct. at 1623 n.3.  It was not contrary to or an unreasonable application of clearly

17   established federal law for the state court to decline to apply a rule that the Supreme Court has

18   expressly stated it has not decided.

20   The Court acknowledges Petitioner's argument that the state court erred in finding the

21   McMillan statements at issue to be encompassed within California's two hearsay exceptions for

22   (1) the statements of co-conspirators and (2) declarations against penal interest.  (Petition at

23   attachment 7a-(1), pp. 1-4.)  As noted earlier, in addition to its finding that the challenged

24   statements by McMillan and Petitioner were nontestimonial for Confrontation Clause purposes, the

25   California Court of Appeal concluded that the statements fell within California's co-conspirator and

26   declarations against penal interest exceptions to the hearsay rule.  (Lodg. No. 8-11.)  "A federal

27   court, of course, cannot review questions of state evidence law."  <u>Henry v. Kernan</u>, 197 F.3d

28   1021, 1031 (9th Cir. 1999); *see also* <u>Estelle v. McGuire</u>, 112 S. Ct. 475, 480 (1991) ("it is not the

1   province of a federal habeas court to reexamine state-court determinations on state law

2   questions"). This resolution of a state law question -- *to wit,* whether the evidence adduced

3   satisfied a state law hearsay exception -- is one on which this federal habeas court must defer to

4   the state courts. *See* Bradshaw v. Richey, 126 S. Ct. 602, 604 (2005) (*per curiam*) ("a state

5   court's interpretation of state law, including one announced on direct appeal of the challenged

6   conviction, binds a federal court sitting in habeas corpus"); Hicks v. Feiock, 108 S. Ct. 1423, 1428

7   & n.3 (1988) (federal habeas court is not at liberty to disregard a California Court of Appeal's

8   rulings on state law when the California Supreme Court has denied review). Here, the state

9   court's conclusion that the challenged statements met the requirements of California Evidence

10  Code §§ 1223 and 1230 is binding in this federal habeas proceeding. *See* Lilly v. Virginia, 527

11  U.S. 116, 125, 119 S. Ct. 1997, 1894 (1999) (plurality opinion) (after noting that the state court

12  had found a statement to fall within the statement against penal interest hearsay exception, the

13  Supreme Court stated: "We assume, as we must, that [the declarant's] statements were against

14  his penal interest as a matter of state law"). Petitioner's argument here is simply that the state

15  court erred in interpreting California law in his case, and his request that this Court second guess

16  the state court's application of California law is not cognizable.

17

18      Further, the state court's finding to which this Court must defer -- *viz.,* that the statements

19  were made as a part of a conspiracy "to avoid prosecution by dissuading witnesses and fabricating

20  alibis and other exculpatory evidence" (Lodg. No. 9 at 8) -- in itself renders federal habeas relief

21  unavailable. As Crawford recognized, "statements in furtherance of a conspiracy" are a classic

22  example of nontestimonial statements that fall outside the protection of the Confrontation Clause.

23  Crawford, 124 S. Ct. at 1367; *see also* United States v. Grasso, 724 F.3d 1077, 1085 n.9 (9th Cir.

24  2013) ("[a]lthough the Sixth Amendment limits the admissibility of testimonial

25  evidence, . . . co-conspirator statements in furtherance of a conspiracy are not testimonial")

26  (citations omitted); United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) ("co-conspirator

27  statements are not testimonial and therefore beyond the compass of *Crawford's* holding"); *see*

28  *further* United States v. Clark, 717 F.3d 790, 816-17 (10th Cir. 2013) (explaining that, under

Crawford, an out-of-court statement made by one codefendant to a third party co-conspirator, in furtherance of the underlying conspiracy, did not implicate the *Bruton* rule, because statements made to further a conspiracy are not testimonial).  Because the statements of McMillan were found, under state law, to constitute the statements of a co-conspirator made to further a conspiracy, these statements fell outside the ambit of the Confrontation Clause and were admissible without constitutional violation. *See* United States v. McCown, 711 F.2d 1441, 1448-49 (9th Cir. 1983) (Bruton was not violated by the admission of statements made by a codefendant, because such statements were made in furtherance of a conspiracy in which the defendant was a participant and the statements fell within the federal hearsay exception for co-conspirator statements).

The California Court of Appeal noted the clearly established federal law and correctly applied it.  Under Section 2254(d)(1), its decision must be accorded deference.  Accordingly, Section 2254(d)(1) precludes federal habeas relief based on Ground One.

## II.   **Petitioner's Sufficiency Of The Evidence Claim Does Not Warrant Federal Habeas Relief.**

In Ground Two, Petitioner contends that the evidence adduced at trial was insufficient to support the gang enhancement allegation which the jury found to be true.[12]  Specifically, Petitioner contends that the gang expert -- Detective Casey -- failed to testify "as to any concrete facts" that would have supported a finding, as required by California Penal Code § 186.22(b)(1)

---

[12]      The jury found the California Penal Code § 186.22(b) gang enhancement allegation to be true with respect to the crimes of robbery, burglary, rape, and sexual penetration by foreign object.  As to the robbery and burglary counts, the jury found that such crimes were committed "for the benefit of, or in association with, the Crips gang" and with the specific intent to promote, further, or assist in criminal conduct by a criminal street gang.  (CT 700-03.)  As to the crimes of rape and sexual penetration by foreign object, the jury found that the crimes were committed with the requisite specific intent "in association with the Crips gang."  (CT 704-07.)

1   ("Section 186.22(b)(1)"), that the crimes of which he was convicted were committed for the

2   benefit of his gang.   (Petition at 5 and attachment 7b(1).)

### A.   The Clearly Established Federal Law That Governs Ground Two

6   The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant

7   may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to

8   constitute the crime with which he is charged." In re Winship, 90 S. Ct. 1068, 1073 (1970).  The

9   Supreme Court announced the federal standard for determining the sufficiency of the evidence

10  to support a conviction in Jackson v. Virginia, 99 S. Ct. 2781 (1979).

12  Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden

13  when challenging the sufficiency of the evidence used to obtain a state conviction on federal due

14  process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  "[T]he relevant

15  question is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

16  rational trier of fact could have found the essential elements of the crime beyond a reasonable

17  doubt." Jackson, 90 S. Ct. at 2789; *see also* Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (*per curiam*)

18  (a habeas court "may set aside the jury's verdict on the ground of insufficient evidence only if no

19  rational trier of fact could have agreed with the jury").  "Put another way, the dispositive question

20  under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond

21  a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (*en banc*) (quoting

22  Jackson).   The Court need not find that the conclusion of guilt was compelled, only that it

23  rationally could have been reached. Drayden v. White, 232 F.3d 704, 709–10 (9th Cir. 2000); *see*

24  *also* United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991) ("The relevant inquiry is not

25  whether the evidence excludes every hypothesis except guilt, but whether the jury could

26  reasonably arrive at its verdict.").

28  A habeas court reviewing a sufficiency of the evidence claim must consider all evidence

admitted at trial, notwithstanding a contention by a petitioner that some of the admitted evidence should have been excluded.  McDaniel v. Brown, 130 S. Ct. 665, 672 (2010) (*per curiam*). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).  The reviewing court need not decide whether it would have found the trial evidence sufficient or scrutinize "the reasoning process actually used by the fact-finder."  Jackson, 99 S. Ct. at 2788–89 & n.13.  Jackson also does not require that the prosecutor affirmatively "'rule out every hypothesis except that of guilt.'" Wright v. West, 112 S. Ct. 2482, 2492 (1992) (citation omitted).   When the factual record supports conflicting inferences, the federal court must presume -- even if it does not affirmatively appear on the record -- that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution.  Jackson, 99 S. Ct. at 2793; *see also* Brown, 130 S. Ct. at 674.  The habeas court must "preserve 'the factfinder's role as weigher of the evidence.'"  *Id.* (citation omitted); *see also* Smith, 132 S. Ct. at 4 (it "is the responsibility of the jury — not the court — to decide what conclusions should be drawn from the evidence admitted at trial").  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (*per curiam*) (citation omitted).

The Court must refer to the substantive elements of the criminal offense as defined by state law and look to state law to determine what evidence is necessary to convict on the crime charged.  *See* Jackson, 99 S. Ct. at 2792 n.16; Juan H., 408 F.3d at 1275.  Further, the Court must defer to the state court's interpretation of state law.  *See* Bradshaw, 126 S. Ct. at 604; Hicks, 108 S. Ct. at 1428 & n.3.

Finally, Section 2254(d)(1) requires federal habeas courts to "apply the standards of *Jackson* with an additional layer of deference."  Juan H., 408 F.3d at 1274; *see also* Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012) (*per curiam*) (describing habeas review of a sufficiency of the evidence claim as based on a "twice-deferential standard"); Johnson, 132 S. Ct. at 2062

("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."). This doubly deferential standard sets a "high bar" for a petitioner, *id.*, and limits the federal habeas court's inquiry to whether the state court's rejection of a sufficiency of the evidence challenge to a conviction was an objectively unreasonable application of <u>Jackson</u>. <u>Emery v. Clark</u>, 643 F.3d 1210, 1214 (9th Cir. 2011); *see also* <u>Johnson</u>, 132 S. Ct. at 2062 (under Supreme Court precedent, a federal court may not grant relief simply because it disagrees with the state court's decision rejecting a sufficiency of the evidence claim; rather, relief is permitted only if the state court's decision was objectively unreasonable).

## B.   **The Relevant Evidence**

Detective Scott Casey, the lead detective in the Lompoc Police Department's gang unit, testified as a gang expert for the prosecution. (RT 1219.) He testified regarding the Crips gang, both in general and as the gang operated in Lompoc. (RT 1224-32.) He testified, *inter alia*, that Crips members typically refer to each other as "Cuz," misspell words that have the letters "C" and "K" next to each other (because Blood gang members use "CK" to stand for Crips Killer), cross through the letter "B," use a hand sign invoking the letter "C," use the word "loc" in their monikers, and have tattoos that reflect their county (805 area code) and/or lettering somehow indicating "Crips," such as "NHC" (for Neighborhood Crip"). (RT 1228-32.)

Detective Casey explained the roles that reputation, respect, and retaliation play in gang culture. He explained that gang members build their reputations by earning respect, which is earned through the commission of violent acts and certain crimes. Retaliation is required any time an act occurs that is perceived as disrespectful, even is it is something as nominal as a dirty look. In gangs, the concept of "putting in work" means to commit criminal activity on behalf of the gang and thereby to show the gang higher ups that the member believes in the gang and is not scared to do things for the gang and, thus, to gain more respect. Gang members who provide

information to law enforcement are "snitches," and other gang members will try to dissuade such behavior through intimidation.  (RT 1239-40.)  In gang culture, a gang member does not testify in court; instead, gang members deal with their problems and each other outside the courtroom. (RT 1272.)  With respect to McMillan's call to Grant (discussed in connection with Ground One), in which McMillan told Grant to "keep it street," Casey interpreted that phrase to mean that Grant should keep the issue out of the courtroom and not involve law enforcement.  (RT 1240-43.) Casey understood the references in the letters discussed earlier to "keeping it 100" and "if it's all 100" to mean that all concerned should stay solid, not break during questioning, and not involve the court process.  (RT 1243.)

Detective Casey opined that the primary activities of the Crips gang are murder, robbery. burglary, narcotic sales, and assault with a deadly weapon.  (RT 1243-44.)  The primary activity of the Central Coast Crips clique are narcotic sales, robbery, battery, and assault with a deadly weapon. (RT 1244.)  Typically, sexual assault is "a no-no" in gang culture; a rapist is looked down upon and could be banished.  (*Id.*)

With respect to the predicate acts committed by Crips members, which were alleged in the case to show a pattern of gang activity for purposes of the Section 186.22(b)(1) allegation, Detective Casey testified about crimes committed by Crips members, including Esley Bailey, Michael Coleman, Jr. (Petitioner's cousin), Marsander Rayford, Odel Seals, and McMillan (two earlier drug trafficking convictions).  (RT 1244-52.)  The trial court subsequently instructed the jury that the court had taken judicial notice that these convictions were true and correct for purposes of the predicate act aspect of the Section 186.22(b)(1) enhancement allegation and that the jury should accept such convictions as fact.  (RT 1458-59.)  Casey identified various of these Crips members in photographs shown to him, including photographs depicting Petitioner and McMillan with those other men.  (RT 1254-56, 1260.)  Casey also identified letters McMillan wrote to some of these other men while he was in prison serving a six-year sentence imposed for a conviction he sustained in 2005.  (RT 1256-59.)

1    Detective Casey testified about his research into prior law enforcement contacts with

2  Petitioner and McMillan.[13]  Detective Casey identified a picture of Petitioner throwing hand signs

3  that stood for East Side Crips.  (RT 1232.)  In March 2003, Petitioner was convicted of a vehicle

4  theft, which was found to be gang-related, and he was ordered to register his gang affiliation with

5  law enforcement.  Petitioner told the police that he was affiliated with the Future Connect gang.

6  (RT 1265-66.)  Casey researched that gang on MySpace, and its MySpace account indicated the

7  gang was a rap gang affiliated with the Crips gang: the Future Connect gang directed members

8  to wear the color blue, call each other "Cuz," and act disrespectfully to the Bloods gang.  (RT

9  1268-70.)  In 2007, Petitioner was involved in a police pursuit, and two Crips-affiliated men were

10  with him in the car.  (RT 1267.)  Petitioner's moniker is "Chuccy," and he has tattoos on his

11  forearm that indicate a Crips affiliation.  (RT 1268.)

12

13    Detective Casey opined that McMillan was an active Crips member on the date of the crimes

14  at issue.  The detective based this opinion on McMillan's past history, his contacts with law

15  enforcement officers, the letters he authored to other gang members while in prison, his phone

16  calls to Gloria Thomas from jail, his observed associations with others, his admissions to law

17  enforcement officers of his Crips membership, and the crimes at issue.  (RT 1275, 1277.)

18  Detective Casey also opined that Petitioner also was an active member of the Crips gang at the

19  time of the crimes at issue.  Case relied upon Petitioner's contacts with law enforcement officers,

20  his associations, MySpace information (including photos in which Petitioner is labeled Captain and

21

_____

22      [13]    A 1996 field interview card showed that McMillan was with Crips members Esley
   Bailey and Michael Coleman, Jr. -- both persons who committed predicate offenses -- at the time
23  the men were stopped by the police, and McMillan said his moniker was San Loc.  (RT 1260-61.)
   A January 1998 field interview card documented a traffic stop in which McMillan was with Crips
24  member Esley Bailey -- also someone who committed one of the predicate offenses.  (RT 1262.)
   A May 1998 field interview card documented that McMillan -- with Crips members including
25  Marsander Rayford, another of the predicate offense perpetrators -- sold cocaine base to an
   undercover officer, admitted his Crips membership, and stated that his moniker was Cyco.  (RT
26  1262-63.)  In August 2004, McMillan was under investigation in connection with a drive-by
   shooting.  (RT 1264.)  In a March 2005 traffic stop, which led to the predicate offense involving
27  Odel Seals, McMillan was with Seals.  (RT 1264.)

28

McMillan is labeled General, indicating that McMillan is a higher up member of the gang and a shot caller), photographs of Petitioner flashing gang signs, his tattoos, and letters Petitioner sent to McMillan.  (RT 1277-79.)

Detective Casey further opined that the burglary and robbery at issue were committed for the benefit of the Crips street gang within the meaning of Section186.22(b)(1).  He based this opinion upon all of the testimony and evidence in the case (including the letters and phone calls discussed in connection with Ground One).  Casey opined that the crimes would benefit the gang, because a home invasion robbery is a violent act and, thus, enhances the respect for and reputation of the gang.  In addition, McMillan's letters indicated that the crimes benefitted the gang by generating money.  (RT 1279-81.)  Detective Casey also opined that the robbery and burglary were committed in association with the Crips gang, because Petitioner and McMillan, who were both admitted Crips members and were associating with each other at the time of the crimes, aided and abetted each other in committing the crimes.  (RT 1282-83.)  Detective Casey opined that the sexual assault crimes were not committed for the benefit of the Crips but were committed in association with the Crips gang, because Petitioner and McMillan associated with each other and aided and abetted each other in committing these crimes.  (RT 1283-85.)  Finally, Detective Casey opined that Petitioner committed the robbery and burglary at the direction of the Crips gang.  (RT 1286-87.)

Detective Casey opined that Troy Grant was affiliated with the Bloods gang.  The detective based this opinion on his prior contacts with Grant, associations by Grant with others that the detective had observed, and the detective's conversations with other officers who knew Grant since he was a teenager.  (RT 1271.)

## C.    **The State Court Decision**

The California Court of Appeal commenced its analysis of Ground Three by noting the

1  standard of review it was applying, *to wit,* that the entire record was reviewed in the light most

2  favorable to the judgment to determine if

4  it contains substantial evidence — that is, evidence that is reasonable, credible, and

5  of solid value — from which a reasonable trier of fact could find the defendant guilty

6  beyond a reasonable doubt. . . . We presume every fact in support of the judgment

7  the trier of fact could have reasonably deduced from the evidence. . . . If the

8  circumstances reasonably justify the trier of fact's findings, reversal of the judgment

9  is not warranted simply because the circumstances might also reasonably be

10  reconciled with a contrary finding. . . . "A reviewing court neither reweighs

11  evidence nor reevaluates a witness's credibility."

13  (Lodg. No. 9 at 11-12; citations omitted.)

15  The California Court of Appeal next noted that, under California law, expert testimony is

16  admissible and sufficient to prove the elements of Section 186.22(b)(1), although an expert's

17  opinion must be based upon the evidence and not speculation or conjecture. (Lodg No. 9 at 12,

18  *citing, inter alia,* People v. Albillar, 51 Cal. 4th 47, 63 (2010), and People v. Gardeley, 14 Cal. 4th

19  605, 617-18 (1996).) The state appellate court further observed that, under California law, more

20  than mere gang membership is required to impose a gang enhancement pursuant to Section

21  186.22(b)(1), because gang members can commit crimes for purely personal reasons. (*Id.*)

23  The California Court of Appeal concluded that "the opinions of the prosecution's gang

24  expert and the evidence supporting those opinions constitute substantial evidence supporting

25  imposition of the gang enhancement." (Lodg. No. 9 at 12.) The state appellate court summarized

26  the testimony by Detective Casey (*id.* at 12-13), as described above, and reasoned as follows:

28  Based on the evidence and his knowledge of gang activities, Casey testified

that it was his opinion that the robbery and burglary were committed for the benefit of the Crips gang, in association with the gang, and at the direction of the gang. His reasons for the opinion included the positive effect that the violence of a home invasion robbery would have on a gang member's reputation, McMillan's expressed desire to generate money for the gang, and the commission of the crimes by multiple gang members. Casey also emphasized that [a] high level gang member (McMillan) had taken a younger and lower level gang member ([Petitioner]) under his wing to commit the crimes. A crime committed by a senior and younger gang member permits the younger person to observe and learn from the actions taken by the senior member. Committing a crime with fellow gang members may also increase the intimidation factor which is important to gang authority in general. (See *People v. Albillar, supra,* 51 Cal. 4th at p. 63.) Casey also noted that the perpetrators called each other "cuz" which is a word used by Crips gang members to describe other Crips. Casey testified that, although the sexual assault was not committed for the benefit of the Crips gang, it was committed in association with the gang. His opinion in this regard was based on the same circumstances as he cited in support for his opinion that the robbery and burglary were gang related.

The gang enhancement also requires proof that the offenses were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Although the evidence was largely circumstantial as to intent, circumstantial evidence is sufficient. "There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.]" (*People v. Miranda* (2011) 192 Cal. App. 4th 398, 411–412.) If substantial evidence establishes the defendant intended to and did commit the offense with other

members of a gang, "the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar, supra,* 51 Cal. 4th at p. 68.)  It is not necessary "that the defendant act with the specific intent to promote, further, or assist a *gang;* the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members.*" (*Id.* at p. 67.)

Moreover, an expert may provide an opinion that embraces the ultimate issue for the jury to determine if it is based on the evidence. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1045–1047, 1049; Evid. Code, § 805.)  Here, Detective Casey testified about the nature of the offenses based on evidence of the offenses and appellants' gang affiliation. He did not simply state how he believed the case should be decided.  And, the jury was not required to accept his opinion or the evidence supporting the opinion. (See *Vang, supra,* at pp. 1049–1050.)  The trial court instructed the jury that "[t]he meaning and importance of any [expert] opinion are for you to decide," and that "[y]ou may disregard any opinion that you find to be unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.)

(Lodg. No. 9 at 13-14.)

## C.    **The State Court's Decision Is Entitled To Deference**

Under California law, expert testimony is admissible on a subject "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." *See* California Evidence Code § 801(a); Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (noting that California law permits such expert opinion testimony).  "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." California Evidence Code § 805; *see also* People v. Roberts, 184 Cal. App.

1    4th 1149, 1193 (2010) (finding an "objection that the opinion of an expert coincides with the

2    'ultimate issue' in the case" to be "untenable" due to California Evidence Code § 805).   In

3    California, prosecutors often, and permissibly, present gang expert testimony to help prove a

4    Section 186.22(b)(1) allegation, including the ultimate issues to be resolved in connection with

5    the enhancement.  *See, e.g.,* People v. Xue Vang, 52 Cal. 4th 1038, 1044-52 (2011) ("Expert

6    opinion that particular criminal conduct benefitted a gang is not only permissible but can be

7    sufficient to support the Penal Code section 186.22(b)(1) gang enhancement.") (*citing* Albillar, 51

8    Cal. 4th at 63).

9

10   In Albillar, the California Supreme Court clarified California law regarding what evidence

11   is sufficient to support a finding that a Section 186.22(b)(1) gang enhancement allegation is true.

12   With respect to Section 186.22(b)(1)'s requirement that the crime benefit a criminal gang, the

13   California Supreme Court held that:  "Expert opinion that particular criminal conduct benefitted

14   a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the

15   conduct was 'committed for the benefit of . . . a [ ] criminal street gang.'"  Albillar, 51 Cal. 4th at

16   63 (citation omitted).  As noted above, a federal habeas court must refer to the substantive

17   elements of the criminal offense as defined by state law, look to state law to determine what

18   evidence is necessary to convict on the crime charged, and defer to the state court's interpretation

19   of state law.  *See* Wainwright v. Goode, 104 S. Ct. 378, 382 (1983) ("the views of the state's

20   highest court with respect to state law are binding on the federal courts").  In analyzing Ground

21   Two, this Court is required to follow Albillar's interpretation of Section 186.22(b)(1).  *See*

22   Bradshaw, 546 U.S. at 76; *see also* Emery, 643 F.3d at 1215-16 (applying Albillar's "authoritative

23   interpretation of section 186.22" to a habeas petitioner's claims).

24

25   As the California Court of Appeal observed, Petitioner and McMillan admitted they were

26   members of a criminal street gang within the meaning of Section 186.22(b)(1).  (Lodg. No. 9 at

27   12 n.7.)  Thus, there can be no factual dispute that both men were Crips members when they

28   committed the crimes at issue.

With respect to the robbery and burglary offenses, as the California Court of Appeal outlined, gang expert Casey explained the bases for his conclusion that the crimes were committed to benefit the gang to which Petitioner and McMillan admittedly belonged.  These included:  both men's use of the gang term "Cuz," during the crimes; McMillan's expressed desire to obtain money for the gang; the positive effect that such a violent home invasion crime would have on the gang's reputation; and the teaching opportunity this afforded McMillan, as the senior and higher level gang member, to provide to Petitioner, the lower level gang member who had been taken under McMillan's wing.[14]  Under Albillar, Casey's expert opinion testimony is sufficient to raise the inference that Petitioner's conduct was committed for the benefit of the Crips gang.  See Albillar, 51 Cal. 4th at 63.  No countervailing evidence was presented and, under Jackson, a single witness's testimony is sufficient to support a conviction or sentencing enhancement.  See Bruce, 376 F.3d at 957–58.  Moreover, the testimony of both Casey and Doe supported a finding that Petitioner and McMillan were acting in association.  McMillan placed Doe in a violent choke hold while Petitioner held a baseball bat, and both men demanded money and weed.  When Doe did not provide the location of these items, both men worked in concert to subdue her, hold her down, and sexually assault her; and thus, both men escalated the force against Doe and thereby increased her fear level.  When Doe capitulated following the sexual assault and gave them the location of the items demanded, both men retrieved them.  As these crimes were committed,

_____

[14]      Petitioner disputes the validity of Casey's testimony about the mentoring relationship.  Petitioner notes that letters written by McMillan to others -- which stated that McMillan was going to generate money for the gang and find a young homie to take under his wing (RT 1295) -- did not mention Petitioner by name, and these letters showed only McMillan's intent, not Petitioner's state of mind.

Evidence was presented that Petitioner wrote a letter to his cousin (Brandy Coleman), in which he said that he and his younger brother might switch their gang monikers to "Baby Cyc" and "Tiny Cyc," and that McMillan's moniker was "Cyc."  (RT 1084-85, 1090.) Petitioner also wrote a letter to McMillan in which Petitioner called McMillan "big bro."  (RT 1104.) As noted earlier, Oliver testified that Petitioner and McMillan were always together; no evidence was presented indicating that McMillan was mentoring someone else.  Further, evidence regarding the crimes indicated that McMillan took the leading role and repeatedly directed Petitioner's actions.  Thus, there was sufficient circumstantial evidence from which an inference could be drawn that a mentoring relationship existed.

1  Petitioner and McMillan referred to each other by the Crips term "Cuz." (RT 303-15.)  A rational
2  juror could have found, based on the testimony of Doe and Casey, that Petitioner committed these
3  crimes to benefit his gang and/or that he and McMillan acted in association within the meaning
4  of Section 186.22(b)(1).

5

6      With respect to the two sexual assault offenses, the evidence of record shows that
7  Petitioner and McMillan worked together to commit these crimes.  Jane Doe testified that the two
8  men referred to each other as "Cuz," one placed her in a choke hold, they both demanded money
9  and weed, and she said, "I don't know, I don't know."  McMillan then knelt her over the bed and
10 told Petitioner to obtain something with which to tie Doe up.  Petitioner did so, and the two men
11 attempted to tie her up.  When they could not do so, one of the men said, "we don't have time
12 for that," Doe felt her pants being pulled down, she felt both men's hands hold her down, and she
13 was then raped and further sexually assaulted with a plastic object.  After the assaults were
14 completed, McMillan again asked Doe about the location of the money and weed; this time she
15 told him where the weed and money could be found.  Petitioner went to retrieve the weed, and
16 McMillan took Doe with him to retrieve the money.  (RT 309-15.)  A reasonable trier of fact could
17 conclude that the two sexual assaults were committed to force Doe to disclose the location of the
18 money and weed and, thus, to aid Petitioner and McMillan in the commission of the robbery and
19 burglary they were committing to benefit their gang.  Thus, even though, as the gang expert and
20 other witnesses testified, rape is a crime that is not approved of by gangs, in this instance, it was
21 a tool used to effectuate crimes that *were* committed to benefit the gang.  A reasonable trier of
22 fact could find, as the gang expert concluded, that Petitioner and McMillan were acting in
23 association as Crips members when they committed the two sexual assaults on Doe and thereby
24 extracted from her the information they needed to commit the robbery and burglary.

25

26     Petitioner's assertion regarding the alleged factual inadequacy of gang expert Casey's
27 opinion is unpersuasive.  Casey testified that, in reaching his opinion, he had listened to the
28 testimony of all the trial witnesses, read the police reports in the case, read the letters written by

1   Petitioner and McMillan, and listened to the recordings of telephone calls.  (RT 1279-80.)  As

2   discussed earlier, he identified particular items of evidence, including McMillan's letter indicating

3   his intent to generate money for the gang.  The jury was free to accept or reject Casey's expert

4   opinion, and as the state court noted, the jury was explicitly instructed that it was not required

5   to accept his opinion.  The jury is presumed to follow the instructions it is given.  Penry v.

6   Johnson, 532 U.S. 782, 799, 121 S. Ct. 1910, 1922 (2001); Weeks v. Angelone, 528 U.S. 225,

7   234, 120 S. Ct. 727, 732 (2000).  While Petitioner disputes the sufficiency of gang expert Casey's

8   opinion, it was within the sole province of the jury to determine whether the testimony by the

9   gang expert was adequately supported and, thus, credible.  "When no improper law enforcement

10  activity is involved, . . . it suffices to test reliability through the rights and opportunities generally

11  designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous

12  cross-examination, protective rules of evidence, and jury instructions on both the fallibility of

13  eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt."

14  Perry v. New Hampshire, 132 S. Ct. 716, 721 (2012); see also United States v. Ginn, 87 F.3d 367,

15  369 (9th Cir. 1996).  Any credibility issues with respect to Casey's expert opinion were factors for

16  the jury to consider in the light of the instructions it received.  See Jones v. Wood, 207 F.3d 557,

17  564 (9th Cir. 2000) (in the context of performing Jackson review, determining witness credibility

18  is a "key question for a jury").  Indeed, a "jury's credibility determinations are . . . entitled to

19  near-total deference under Jackson."  Bruce v. Terhune, 376 F.3d 950, 957-59 (9th Cir. 2004)

20  (noting further that, "[e]xcept in the most exceptional circumstances, Jackson does not permit

21  us to revisit credibility determinations"); see also Schlup v. Delo, 115 S. Ct. 851, 868 (1995)

22  ("under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of

23  review").  The reviewing court "must respect the province of the jury to determine the credibility

24  of witnesses."  Walters, 45 F.3d at 1358.

25

26       Given the instruction it received and the verdict it reached, the jury necessarily found that

27  the expert opinion testimony of Casey, along with Doe's testimony regarding what occurred, was

28  sufficient to establish, beyond a reasonable doubt, that the elements of Section 186.22(b)(1) were

1  met.  Of course, Petitioner's jury was not required to draw such a finding, but given that enough

2  evidence was presented to the jury to support such a finding, due process is satisfied.  As a

3  rational and reasonable jury could reach the true finding on the Section 186.22(b)(1)

4  enhancement alleged, this Court is not permitted, under the <u>Jackson</u> standard, to find that the

5  jury should have concluded otherwise.  <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. at 2789; <u>Bruce</u>, 376

6  F.3d at 957.

7

8  In sum, the state court did not unreasonably apply <u>Jackson</u> in concluding that there was

9  sufficient evidence to support the jury's finding that all the crimes at issue were committed for the

10  benefit of, or in association with, Petitioner's criminal street gang.  Petitioner has not shown that

11  the state court's application of the <u>Jackson</u> standard to his sufficiency of the evidence claim was

12  contrary to, or an unreasonable application of, that test.  Accordingly, under Section 2254(d)(1),

13  the Court is required to defer to the state court's decision with respect to Ground Two, and the

14  claim must be, and is, DENIED.

15

16  **III.**   **Petitioner's Expert Testimony Claim Does Not Warrant Federal Habeas**

17     **Relief.**

18

19  In Ground Three, Petitioner asserts the trial evidence established that, although he and

20  Grant were in different gangs, their gangs were not rivals and often associated with each other,

21  and thus, this evidence proved that the charged robbery and burglary were not gang-related.

22  Petitioner argues that the jury would not have found these crimes to be gang-related -- and,

23  indeed, likely would not have convicted Petitioner of robbery and burglary at all -- had Detective

24  Casey not provided inflammatory and irrelevant testimony about the meaning of keeping it "on

25  the street" as well as gang mores and practices and the Crips gang in general, as opposed to

26  limiting his testimony to a discussion of the Central Coast Crips gang, to which Petitioner

27  admittedly belonged.  Petitioner contends that "none" of Casey's testimony about gang matters

28  was relevant to a determination of Petitioner's guilt, and Casey's testimony bore only a

1    "questionable" relation to the charged Section 186.22(b)(1) enhancement.  (Petition at 5-6 and

2    attachment 7-c(1).)[15]

3

4    ## A.    The State Court Decision

5

6         The California Court of Appeal rejected Petitioner's contention that the gang testimony of

7    Detective Casey violated Petitioner's federal due process rights, finding that the testimony was

8    not inflammatory and/or that its probative value outweighed any potential prejudice.  The state

9    appellate court determined that the trial court did not abuse its discretion, under California

10   Evidence Code § 352,[16] in allowing Casey to provide expert testimony about the Crips gang and

11   gang matters in general and about the gang concept of keeping a dispute "on the street."  As the

12   California Court of Appeal observed:

13

14        The expert only testified briefly regarding the history of the Crips and Bloods, and

15        that testimony was probative and helpful to understanding the expert's testimony

16        generally.  As to evidence that appellants expressed a desire to keep the matter "on

17        the street" and out of court, appellants fail to show that the evidence was

18

19        [15]    In the section of his Traverse addressed to Ground Three, Petitioner raises a new

20   claim, *to wit*, that:  under California law, an expert may not testify that a defendant possessed a
     particular knowledge or intent; and Casey's testimony violated this rule when he testified that the

21   robbery and burglary were committed to benefit Petitioner's gang because such criminal conduct
     would elevate the reputation of the gang.  This is a distinctly different claim from that alleged as

22   Ground Three in the Petition, as that claim was exhausted in the state courts.  Moreover,
     Petitioner did not raise this belatedly-asserted claim in his petition for review (*see* Lodg. No. 11,

23   *passim*), nor was it raised by McMillan in the state high court (*see* Lodg. No. 10, *passim*); thus,
     the claim is unexhausted.  Accordingly, this new, unexhausted claim will not be considered.  *See*

24   28 U.S.C. § 2254(b)(1); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (court has

25   discretion to refuse to consider claim raised for first time in traverse).

26        [16]    California Evidence Code § 352 provides:  "The court in its discretion may exclude

27   evidence if its probative value is substantially outweighed by the probability that its admission will
     (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice,

28   of confusing the issues, or of misleading the jury."

inflammatory and, clearly, its probative value exceeded the risk of undue prejudice.

(Lodg. No. 9 at 15.)

### B.      The Relevant Federal Law That Governs Ground Three

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 112 S. Ct. at 480 (internal citations omitted).  Consequently, state court evidentiary rulings cannot serve as a basis for habeas relief, unless an error occurred that rose to the level of a federal constitutional violation. See id.; see also Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) ("the presence or absence of a state law violation is largely beside the point").  "[A] state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." Spivey v. Rocha, 194 F.3d 971, 977–78 (9th Cir. 1999); see also Larson v. Palmateer, 515 F.3d 1057, 1065 (9th Cir. 2008).

A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).  Evidence introduced by the prosecution often will raise more than one inference, some permissible and some not, and it is up to the jury to sort them out in the light of the trial court's instructions. Id.; Jammal, 926 F.2d at 920.  "Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" Id. (citation omitted).

AEDPA further restricts the federal habeas review available for claims based on asserted evidentiary error.  The Ninth Circuit has explained that, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established federal law,' as laid out by the

1    Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). "The Supreme

2    Court has made very few rulings regarding the admission of evidence as a violation of due

3    process" and "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

4    evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.*

5

6         **C.**    **Ground Three Fails Under Section 2254(d)(1).**

7

8       There is no clearly established Supreme Court precedent applicable to, or which supports,

9    the third claim raised by Petitioner. As the Ninth Circuit found in Holley, 568 F.3d at 1101, the

10   Supreme Court has not clearly held that the "admission of irrelevant or overtly prejudicial evidence

11   constitutes a due process violation sufficient to warrant issuance of the writ." *See also* Romano

12   v. Oklahoma, 114 S. Ct. 2004, 2011 (1994) ("That the evidence may have been irrelevant as a

13   matter of state law, however, does not render its admission federal constitutional error.") (*citing*

14   Estelle, 112 S. Ct. at 479-80).

15

16       "[I]n the absence of a Supreme Court decision that 'squarely addresses the issue' in the

17   case before the state court, or establishes an applicable general principle that 'clearly extends' to

18   the case," it cannot be said that clearly established federal law exists for purposes of either prong

19   of Section 2254(d)(1), and a federal court must defer to the state court decision. Moses, 555 F.3d

20   at 760 (*citing* Wright v. Van Patten, 128 S. Ct. 743, 745-47 (2008) (*per curiam*); Carey, 127 S. Ct.

21   at 654; and Panetti v. Quarterman, 127 S. Ct. 2842, 2858 (2007)); *see also* Holley, 568 F.3d at

22   1097-98 ("[w]hen there is no clearly established federal law on an issue, a state court cannot be

23   said to have unreasonably applied the law as to that issue"). Because the issue raised by Ground

24   Three remains open under Supreme Court precedent, there is no clearly established federal law

25   that the state court acted contrary to or unreasonably applied for purposes of Section 2254(d)(1),

26   and thus, habeas relief is foreclosed.

27

28       Even if, however, deference to the state court decision at issue in Ground Three was not

1   required by Section 2254(d)(1), the claim still would fail, because Petitioner has not established

2   a violation of his rights to due process and a fair trial.  To the extent that Petitioner contends the

3   California Court of Appeal erred in finding that the admission of Detective Casey's testimony did

4   not violate California Evidence Code § 352, Ground Three is not cognizable, as such a contention

5   presents only a state law issue which may not be considered on federal habeas review, as well

6   as a resolution of a state law question to which this Court must defer.  *See, e.g.*, Bradshaw, 126

7   S. Ct. at 604; and Estelle, 112 S. Ct. at 480.

8

9          In any event, the California Court of Appeal identified reasons why the challenged expert

10  testimony was not unduly inflammatory and was relevant, and thus, its admission was not

11  constitutionally violative.  Jammal, 926 F.2d at 920.  Detective Casey's general testimony about

12  the Crips and gang mores and behaviors provided context for his more specific testimony about

13  why be believed the crimes were committed for the benefit of and/or in association with a criminal

14  street gang.  This testimony explained much of the behavior of Petitioner and McMillan --

15  including, *inter alia*, their use of the term "Cuz," the mentoring behavior shown, the intimidating

16  action they took against Doe, etc. -- and was relevant to the charged Section 186.22(b)(1)

17  allegation.  The gang expert's testimony about the meaning of keeping it "on the street" plainly

18  was relevant to his Section 186.22(b)(1) expert opinion, given the repeated use of that phrase

19  by McMillan and Petitioner in their communications with third parties (as discussed in connection

20  with Ground One).  Indeed, without it, much of the evidence of such communications could have

21  been confusing to the jury, and an expert properly may testify on a subject beyond common

22  experience to assist the trier of fact.  Briceno, 555 F.3d at 1077.

23

24         It was objectively reasonable for the state court to find that, under existing law, Petitioner's

25  federal rights to due process and a fair trial were not violated by the portions of Detective Casey's

26  testimony challenged in Ground Three.  At a minimum, the Court cannot say that "there is no

27  possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme

28  Court precedent.  Richter, 131 S. Ct. at 786.  As a result, Section 2254(d)(1) requires the Court

1    to accord deference to the state court's decision on Ground Three, and federal habeas relief must

2    be denied.

3

4                                        *    *    *    *    *

5

6         For the reasons discussed above, Petitioner has not shown that the state court's rejection

7    of the three claims set forth in the Petition was either contrary to, or an unreasonable application

8    of, clearly established federal law.  Section 2254(d)(1), therefore, forecloses federal habeas

9    relief.[17]  Accordingly, IT IS ORDERED that:  (1) the Petition is denied; and (2) Judgment shall be

10   entered dismissing this action with prejudice.

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22

23        [17]    Petitioner requests an evidentiary hearing.  (Petition at 1.)  Because his claims are

24   governed by the Section 2254(d) standard of review, his request for an evidentiary hearing is
     foreclosed.  *See* Pinholster, 131 S. Ct. at 1398 (habeas review under Section 2254(d)(1) is limited
     to the record before the state court that adjudicated the claim on the merits); *see also*

25   Gulbrandson v. Ryan, 738 F.3d 976, 993-94 (9th Cir. 2013) (when a state court has denied habeas

26   claims on their merits, Pinholster precludes "further factual development of these claims" through
     an evidentiary hearing to determine whether Section 2254(d)(1) or (d)(2) is satisfied), *cert.*

27   *denied*, 134 S. Ct. 2823 (U.S. June 16, 2014); Stokley v. Ryan, 659 F.3d 802, 809 (9th Cir. 2011)
     ("*Pinholster*'s limitation on the consideration of [a petitioner's] new evidence . . . in federal habeas

28   proceedings also forecloses the possibility of a federal evidentiary hearing").

1      In addition, pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the Court has considered whether a certificate of appealability is warranted in this case.  *See* 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 120 S. Ct. 1595, 1604 (2000).  The Court concludes that:  reasonable jurists would not find its resolution of the Petition to be "debatable or wrong"; and the issues raised by Petitioner are not "adequate to deserve encouragement to proceed further."  Slack, 120 S. Ct. at 1603.  Accordingly, issuance of a certificate of appealability is not warranted and, thus, a certificate of appealability is DENIED.

      IT IS SO ORDERED.

DATED: August 13, 2014.

_Margaret a. Nagle_
_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE